### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------X
RODOPI SISAMIS-MARKMAN, MICHAEL          :
MARKMAN, I.S.M., An.S.M., and At.S.M.,   :        COMPLAINT
                                         :
                        Plaintiffs,      :
                                         :        Civil Action No.
        -against-                        :
                                         :        JURY TRIAL
LEADERSHIP PREPARATORY OCEAN HILL        :        DEMANDED
CHARTER SCHOOL, RACHEL KING, RITA CHAN,  :
CAROLINE KERNS, EMILY NAGEL and OCTAVIA  :
CHARLES,                                 :
                                         :
                        Defendants.      :
------------------------------------------------------------------X
```

### NATURE OF THE ACTION

1.      This is an action for damages and injunctive relief under 42 U.S.C. § 1983, and related state law claims, arising out of Defendants' religious discrimination against Plaintiffs I.S.M., An.S.M., and At.S.M. (collectively, the "Sisamis-Markman Children").

2.      As set forth herein, Leadership Preparatory Ocean Hill Charter School ("LPOH"), and LPOH's administrators and employees, including Rachel King, Rita Chan, Caroline Kerns, discriminated against the Sisamis-Markman Children by: (a) declining and refusing to take appropriate steps to respond to anti-Jewish bullying in the classroom and school; and (b) upon information and belief, declining and refusing to take even such steps to address anti-Jewish bullying that the school and its employees had taken to address other forms of religious and/or racial discrimination.

3.      By so doing, Defendants deprived the Sisamis-Markman Children of their right to a public education and equal protection, caused the Sisamis-Markman Children and their parents'

significant pain and suffering, and enabled real and direct physical harm to I.S.M., as well as stress-induced harm to his parents.

4.      As set forth below, Defendants' conduct also violated a raft of New York state laws, including the New York Human Rights Law and the New York Dignity For All Students Act ("DASA").

5.      Plaintiffs thus bring this action for damages and injunctive relief, seeking both recompense for the significant expenses they now must incur as a result of Defendants' acts and violations, and to ensure that no other LPOH students are subjected to similar violations moving forward.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

7.      Venue is appropriate in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2).

## THE PARTIES

8.      Plaintiffs Rodopi Sisamis-Markman and Michael Markman are the parents of plaintiffs I.S.M., An.S.M., and At.S.M. (collectively, the "Sisamis-Markmans"), their 8-year old triplets. The Sisamis-Markmans are citizens of New York residing in Brooklyn, New York.

9.      The Sisamis-Markmans are Jewish.

10.     Upon information and belief, Defendant LPOH is a New York not-for-profit education corporation.  Its principal place of business is located at 51 Christopher Ave, Brooklyn, NY.

11.     Upon information and belief Defendant Rachel King is the Dean or Principal at LPOH. Upon information and belief, King is a citizen of the State of New York, residing at 57 Reade St, New York, NY.

12.     Defendant Rita Chan is the Director of Operations at LPOH.  Upon information and belief, Chan is a citizen of the State of New York, residing at 216 Bergen Street, Brooklyn, NY.

13.     Upon information and belief, Defendant Caroline Kerns is the Principal or Dean of Curriculum and Instruction at LPOH.  Upon information and belief, Kerns is a citizen of the State of New York, residing at 75 Clinton Street, Brooklyn, NY.

14.     Defendant Emily Nagel was I.S.M.'s classroom teacher at LPOH during the 2018-2019 school year.  Upon information and belief, Nagel is a citizen of the State of New York, residing in Brooklyn, NY.

15.     Defendant Octavia Charles was An.S.M.'s classroom teacher at LPOH during the 2018-2019 school year, and I.S.M.'s classroom teacher at LPOH during the 2017-2018 school year.  Upon information and belief, Charles is a citizen of the State of New York, residing at 1320 St. John's Place, Brooklyn, NY.

## FACTUAL BACKGROUND

**A.     LPOH and DASA**

16.     LPOH is a New York charter school located in Brooklyn, New York, which describes its mission as "teach[ing] students the academic skills, knowledge, and personal traits necessary to succeed in high school, college, and beyond ..."

17.     It advertises itself as a school that uses "structure, academic rigor, and extra support" to help its students achieve both "college success" and "exemplary character."

18.     As a New York public school, LPOH is subject to DASA.  Signed into law in September 2010, in the words of the New York State Education Department DASA "seeks to provide the State's public elementary and secondary school students with a safe and supportive environment free from discrimination, intimidation, taunting, harassment, and bullying on school property, a school bus and/or at a school function."  *See* http://www.p12.nysed.gov/dignityact/.

19.    Thus, both LPOH's mission and New York law required LPOH to adequately address antisemitic intimidation, discrimination, taunting, harassment, and bullying at LPOH.

20.    This, it failed to do.

**B.    The Sisamis-Markman Children Are Bullied at LPOH**

21.    In September 2015, the Sisamis-Markmans enrolled their children at LPOH for kindergarten.

22.    The Sisamis-Markman Children had a good year in the LPOH kindergarten; they made friends and grew academically during the 2016-2017 school year.

23.    At no point during kindergarten did any of the Sisamis-Markman Children experience bullying of any kind, antisemitic or otherwise.

24.    As time went by, the Sisamis-Markmans began to take on more outwardly noticeable Jewish religious practices; for example, Ms. Sisamis-Markman would wear skirts or cover her hair for religious reasons.

25.    These changes occasioned comment at the school.

26.    In connection with their religious evolution, I.S.M. began to wear tzitzit – a fringed, four-cornered garment worn underneath the shirt – and a yarmulke.

27.    At the outset of the 2017-2018 school year, I.S.M. wore tzitzit and a yarmulke to LPOH for the first time.

28.    Beginning then, he began to be the target of antisemitic bullying by other children.

29.    Children in I.S.M.'s class would knock his kippah off of his head, or shove him to the ground, yank up his shirt, and pull his tzitzit out of his pants.

30.    In addition, if one of his tzitzit came untucked, the children would mock him for having "a tail."

31.     Mr. and Ms. Sisamis-Markman held multiple meetings with I.S.M.'s teacher, Mrs. Charles, to attempt to address the bullying, but no action was taken by the school.

32.     Upon information and belief, when similar issues arose with students of other religions, the school took proactive steps to address potential bullying, such as explaining to children why a muslim classmate would wear a hijab, and stressing that such differences were to be respected.

33.     That was not the approach LPOH took with the antisemitic bullying targeting I.S.M. Instead, the school insisted that I.S.M. should give a "presentation" about why he was dressed differently.

34.     Though Ms. Sisamis-Markman complained to the administration, including to King, the taunting and hitting continued for the remainder of the school year.

35.     Upon information and belief, the school took no meaningful steps to address the antisemitic bullying it had been made aware of.

36.     Upon information and belief, the school's decisions regarding how to handle the bullying were based on the fact that the bullying was antisemitic, rather than Islamophobic or racist.

37.     Upon information and belief, the school would have shown greater concern, and taken additional steps – including but not limited to proactively addressing the class and imposing consequences on the bullying students – had the bullying been Islamophobic or racist, rather than "merely" antisemitic.

38.     The impact of the bullying on I.S.M. was dramatic, and painful for his parents to witness; he began refusing to wear his yarmulke or other visibly Jewish dress in public unless it was in a 'Jewish space.'

39.     Matters worsened in the 2018-2019 school year.

40. Though the bullying recommenced, the school again simply allowed it to persist.

41. One child in I.S.M.'s class, Logan, would hit him nearly every day. Though this often occurred in front of I.S.M.'s teachers, they did nothing to protect I.S.M. or punish Logan.

42. One day, Logan pulled up I.S.M.'s shirt and even reached into the back of I.S.M.'s pants, looking for I.S.M.'s tzitzit.

43. Instead of dealing with the bullying, teachers began reprimanding I.S.M. for "erratic" behavior and sending *him* to the Dean's office for discipline. At one point, the school suspended I.S.M. for purportedly "inappropriately touching" his teacher, Ms. Nagel – a claim and suspension the school, through Chan, later admitted was unwarranted.

44. Upon information and belief, Nagel personally witnessed multiple incidents of bullying that she failed to either report to the school administration or inform the Sisamis-Markmans about.

45. Rather, and reflecting her priorities, Nagel communicated her false report of inappropriate touching to the administration, and routinely communicated her concerns with I.S.M.'s classroom behavior to the parents, while neglecting to inform them of the bullying she was observing and condoning.

46. When the Sisamis-Markmans relayed their concerns to King and asked that I.S.M. be switched to a different class or teacher, the school brushed off their concerns and suggested that the true source of the problem was I.S.M. himself.

47. By this point, I.S.M.'s sister, An.S.M., was being bullied as well.

48. During the 2018-2019 school year, An.S.M. was routinely bullied by classmates for being held back a year. As the year went on, classmates would tell her "everyone here hates you," and she began being confronted in the school bathrooms about her Jewishness.

6

49.  The bullying has adversely impacted An.S.M.'s mental health.

50.  Her father, Michael, routinely complained to An.S.M.'s teacher, Mrs. Charles, about the bullying his daughter was suffering.  Like Nagel, and as she had with respect to the bullying of I.S.M. in the prior school year, Charles neither meaningfully intervened nor reported the bullying to the administration.

51.  By mid-November, I.S.M. was being bullied on a daily basis, while the school – and the adults he should have been able to rely on – did nothing.

52.  As a result, his behavior deteriorated.  On November 13, 2018, Kerns threatened to expel I.S.M. if his behavior didn't improve.

53.  Upon information and belief, no similar threat was made to the children engaged in antisemitic taunts or physical attacks on I.S.M.

54.  To the contrary, when the Sisamis-Markmans asked Kerns if I.S.M.'s bullies would be expelled if their behavior continued, Kerns replied that being bullied was "part of life."

55.  Listening to Kerns' callous response, I.S.M. began to cry.  At.S.M. and An.S.M. watched Nagel and Kerns laughing as I.S.M. cried.

56.  On or about that day, Logan punched I.S.M. in the leg so hard that I.S.M. had trouble walking; he came home that day with a large bruise on his knee.  The next day, he came home with deep scratches on his arm.

57.  When the Sisamis-Markmans asked I.S.M. if this type of physical assault happened often, he responded, crying and extremely upset, "all the time, every day."

58.  The Sisamis-Markmans called King about the incident, but she did not return their call.

59.     When the Sisamis-Markmans brought I.S.M. to the pediatrician, she examined the bruise and scheduled an appointment for I.S.M. with an orthopedic surgeon the next day.  A contemporaneous photo of the bruise is annexed hereto as Exhibit A.

60.     The Sisamis-Markmans filed a formal complaint with LPOH and asked that I.S.M. be switched to a new class and not left alone with Kerns.

61.     Again, LPOH did nothing.

62.     A week later, on November 20, 2019, Logan hit I.S.M. repeatedly throughout the day, including in the face, all in front of Ms. Nagel, and I.S.M. came home with a split lip.  Before he came home, the school called the Sisamis-Markmans to tell them a different – and implausible – story: that I.S.M. had been playing with his bully, Logan, and gotten into an "altercation."

63.     After Thanksgiving break, the Sisamis-Markmans met with King and Kerns and strongly voiced their concerns about the assault.

64.     Again, LPOH did nothing.

65.     Unsurprisingly, the unaddressed antisemitism continued, and worsened.

66.     On January 15, 2019, King informed Ms. Sisamis-Markman that I.S.M. had been taunted in class, with one girl standing on a chair and announcing "I.S.M. is a Jew!" and another classmate whispering "Jewish, Jewish, Jewish" at him.

67.     That same day, Ms. Sisamis-Markman got a call from I.S.M.' classroom teacher, Ms. Nagel.  Remarkably, Nagel was not calling to discuss the antisemitism in her classroom, but to complain about *I.S.M.'s* behavior.

68.     The school later suggested that I.S.M. "explain" to his abusers that their antisemitic behavior was "hurting his feelings"; during this same time period, At.S.M. and An.S.M. were being confronted about their Jewishness in LPOH's hallways and bathrooms.

69.    In January, 2019, the Sisamis-Markmans learned that LPOH had a DASA Coordinator specifically designated to handle bullying complaints – a fact that LPOH was legally required to, but had not, disclosed to its students' parents.

70.    Upon learning of this, the Sisamis-Markmans filed a formal DASA complaint with the school's DASA Coordinator on January 17, 2019 (the "DASA Complaint").

71.    The DASA Coordinator informed Ms. Sisamis-Markman that she had not received their prior formal complaint about the November 13, 2018 incident.

72.    Six days after the Sisamis-Markmans filed their DASA Complaint, they received a letter from LPOH threatening to call the Administration for Child Services ("ACS") due to I.S.M.'s purported "chronic absences."

73.    Those absences related to a surgery I.S.M. had undergone at the start of the school year, months earlier, and for which the school had been provided documentation.

74.    Upon information and belief, the threat to call ACS was made in retaliation for the Sisamis-Markmans filing the formal DASA Complaint.

75.    The bullying persisted; on February 12, 2019, for example, a student approached I.S.M. and made the sign of the cross.  Though the incident happened in front of Chan, nothing was done.

C.    **The School's Insufficient DASA Investigation**

76.    After the Sisamis-Markmans filed their formal DASA Complaint, LPOH conducted a DASA investigation.

77.    On February 7, 2018, Mrs. Sisamis-Markman met with Felix Li, an LPOH board member, to discuss the results of the investigation.

78.    Mr. Li conveyed that the school had interviewed I.S.M. without his parents' presence or consent.

79. Indeed, the Sisamis-Markmans had expressly conveyed to the school that they wanted to be present for any such interview, and that I.S.M. was not to be interviewed without them there.

80. During that interview, I.S.M. conveyed that he was afraid for others in the school to know that he was Jewish.

81. Nevertheless, according to Li, LPOH concluded that I.S.M. was not "bullied" as defined by DASA.

82. Accordingly, the school took no remedial action under DASA.

83. The school did offer to move I.S.M. to a different classroom – but expressed concern that moving him would make the situation worse.

84. Incomprehensibly, the school conveyed that if I.S.M. was moved, one of the children who had been bullying him would also be moved to the other class.

85. Upon information and belief, during the DASA investigation and in their prior responses to the Sisamis-Markmans' notifications of bullying incidents, LPOH, Chan, King, and Kerns intentionally opted not to consider the complained of conduct "bullying", or to respond to it as such, because the bullying was antisemitic rather than based on any other protected characteristic.

86. In addition or in the alternative, upon information and belief, during the DASA investigation and in their prior responses to the Sisamis-Markmans' notifications of bullying incidents, LPOH, Chan, King, and Kerns intentionally opted not to consider the complained of conduct "bullying", or to respond to it as such, because doing so would have triggered reporting and other requirements under DASA.

87.    As a result of LPOH's inaction, the Sisamis-Markmans were compelled to remove the Sisamis-Markman Children from the school after the President's Week vacation.

**D.    The Antisemitic Bullying's Effect on the Sisamis-Markman Children**

88.    The bullying described above had a severe adverse effect on the Sisamis-Markman Children.

89.    I.S.M. repeatedly expressed that he was afraid to go to school given the bullying.

90.    Due to the fear generated by the repeated physical assaults he was subjected to while in LPOH's care, I.S.M. also began refusing to wear religious articles of clothing that would enable strangers to identify him as Jewish, including to LPOH.

91.    I.S.M.'s academic progress suffered because of the antisemitic bullying he was subjected to at LPOH.

92.    I.S.M.'s behavior in class suffered because of the antisemitic bullying he was subjected to at LPOH.

93.    I.S.M. has required psychiatric care to address the trauma he suffered because of the antisemitic bullying he was subjected to at LPOH.

94.    As a result of the bullying, I.S.M. suffered from sleep distress – routinely yelling and crying out in his sleep during 2018 and 2019, loudly enough to be heard from across the apartment.

95.    At.S.M. and An.S.M. likewise suffered from the antisemitic bullying they witnessed and experienced at LPOH.

96.    At.S.M. and An.S.M. also expressed fear and concern about returning to school due to the antisemitic bullying they witnessed and experienced at LPOH.

97.   Both At.S.M. and An.S.M. have developed anxiety about being around non-Jews –
including, in At.S.M.'s case, non-Jewish family members – as a result of the antisemitic bullying
they witnessed and experienced at LPOH.

98.   Both At.S.M. and An.S.M. have decided not to publicly identify as Jewish as a result of
the antisemitic bullying they experienced and witnessed at LPOH.

99.   At.S.M. in particular now believes that all non-Jews harbor antisemitic views.

100.   Upon information and belief, the stress of the antisemitic bullying At.S.M. experienced
and witnessed at LPOH contributed to her hospitalization in 2018.

101.   At.S.M. and An.S.M. have required psychiatric care to address the trauma they suffered
because of the antisemitic bullying they witnessed and experienced at LPOH.

102.   The children's therapist has advised that, in order to repair the damage caused by the
antisemitic bullying they witnessed and experienced at LPOH, the children must be placed in a
Jewish school.

## COUNT I
### (Violation of 42 U.S.C. § 1983 – Free Exercise Clause – Against All Defendants)

103.   Plaintiffs repeat and reallege the allegations of Paragraphs 1-103 above as though more
fully set forth herein.

104.   All of the actions of Defendants herein were done by Defendants under color of New
York State law.

105.   The actions of Defendants herein had the effect of depriving I.S.M. of his right, under
the First Amendment to the Constitution, to freely exercise his religion.

106.   Defendants' actions were intentional, willful, malicious, and in gross and reckless
disregard of Plaintiffs' Constitutional rights.

107.  As a result of Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial, but which is reasonably believed to be not less than $3,000,000.00, exclusive of costs, attorneys' fees, and punitive damages.

108.  In addition, Plaintiffs seek preliminary and permanent injunctive relief requiring Defendant LPOH to establish adequate protocols for reporting and addressing religious and ethnic discrimination and bullying, including but not limited to antisemitic bullying, at LPOH.

## COUNT II
(Violation of 42 U.S.C. § 1983 – Equal Protection Clause – Against All Defendants)

109.  Plaintiffs repeat and reallege the allegations of Paragraphs 1-108 above as though more fully set forth herein.

110.  Plaintiffs are members of a protected class and were unlawfully discriminated against because of their religion, Judaism.

111.  The Sisamis-Markman Children were similarly situated to other students at LPOH.

112.  Defendants deliberately refused to take steps to correct the antisemitic bullying the Sisamis-Markman Children were being subjected to, despite having taken steps to correct or prevent other forms of bullying, including, upon information and belief, bullying of Muslim students on account of their religion, in violation of the Equal Protection clause of the Fourteenth Amendment.

113.  Defendants' actions were intentional, willful, malicious, and in gross and reckless disregard of Plaintiffs' Constitutional rights.

114.  As a result of Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial, but which is reasonably believed to be not less than $3,000,000.00, exclusive of costs, attorneys' fees, and punitive damages.

115. In addition, Plaintiffs seek preliminary and permanent injunctive relief requiring Defendant LPOH to establish adequate protocols for reporting and addressing religious and ethnic discrimination and bullying, including but not limited to antisemitic bullying, at LPOH.

**COUNT III**
(Violation of 42 U.S.C. § 1983 – Title VI of the Civil Rights Act of 1964 – Against All Defendants)

116. Plaintiffs repeat and reallege the allegations of Paragraphs 1-115 above as though more fully set forth herein.

117. Title VI of the Civil Rights Act of 1964 bars discrimination on the basis of national origin or ethnicity, including Jewish ethnicity.

118. Defendants were placed on notice of, and had actual knowledge of, the fact that the Sisamis-Markman Children were being bullied on the basis of their Jewish ethnicity.

119. Defendants were placed on notice of, and had actual knowledge of, the fact that I.S.M. was being bullied on the basis of his Jewish garb.

120. Defendants were deliberately indifferent to the bullying alleged above.

121. Indeed, upon information and belief, Defendants took no meaningful steps in response to the bullying.

122. Indeed, upon information and belief, Defendants took no steps at all in response to the bullying.

123. The bullying was so severe, pervasive, and objectively offensive as to have deprived the Sisamis-Markman Children of access to the educational benefits and opportunities provided by LPOH.

124. As a result of Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial, but which is reasonably believed to be not less than $3,000,000.00, exclusive of costs, attorneys' fees, and punitive damages.

125.  In addition, Plaintiffs seek preliminary and permanent injunctive relief requiring Defendant LPOH to establish adequate protocols for reporting and addressing religious and ethnic discrimination and bullying, including but not limited to antisemitic bullying, at LPOH.

## COUNT IV
(Violation of N.Y. Executive Law § 296(4) – Against LPOH)

126.  Plaintiffs repeat and reallege the allegations of Paragraphs 1-126 above as though more fully set forth herein.

127.  The New York Human Rights Law provides that it is an unlawful discriminatory practice for an education corporation to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, gender identity or expression, military status, sex, age or marital status."

128.  LPOH is an education corporation.

129.  By the conduct described above, LPOH permitted the harassment of the Sisamis-Markman Children on the basis of their ethnicity and religion.

130.  As a result of Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial, but which is reasonably believed to be not less than $3,000,000.00, exclusive of costs, attorneys' fees, and punitive damages.

131.  In addition, Plaintiffs seek preliminary and permanent injunctive relief requiring Defendant LPOH to establish adequate protocols for reporting and addressing religious and ethnic discrimination and bullying, including but not limited to antisemitic bullying, at LPOH.

## COUNT V
(Violation of the Dignity for All Students Act – Against All Defendants)

132.  Plaintiffs repeat and reallege the allegations of Paragraphs 1-131 above as though more fully set forth herein.

133.   The New York State Legislature enacted the Dignity for All Students Act, codified at Sections 10-18 of the New York Education Law, in order to advance the State policy of providing all public school students with an environment free of discrimination and harassment.

134.   Under DASA, public school students, such as the Sisamis-Markman Children, are entitled to be free from, among other things, ethnic- or religiously-based harassment and bullying by school employees or students on school property.

135.   In addition, DASA requires school districts and schools to develop policies, procedures, and guidelines that, *inter alia*:

     a.   Identify a school employee responsible (the "DASA Coordinator") for receiving reports of bullying, harassment, and discrimination;

     b.   Enable parents and students to make such reports, including by identifying the DASA Coordinator to parents;

     c.   Require school employees to report to the DASA Coordinator any bullying, harassment, or discrimination that the employee witnessed or received a report of;

     d.   Require a thorough investigation of the reported bullying, harassment, and discrimination;

     e.   Require the school to take prompt action reasonably calculated to end such bullying, harassment, and discrimination, eliminate hostility in the environment, create a more positive school culture, prevent future recurrences and ensure the safety of the victimized student;

     f.   Prohibit retaliation against individuals reporting bullying, harassment, and discrimination;

g.  Require the school to annually provide parents, students and employees with a copy of the school's policies, including notification of the reporting processes;

h.  Require the school to maintain copies of the such policies on its website;

i.  Are to be used in training employees to address bullying, harassment, and discrimination;

j.  Having at least one staff member thoroughly trained to handle human relations regarding protected classifications; and

k.  Develop balanced and age-appropriate responses to student harassment, bullying, and discrimination.

136.  DASA also specifically bars school districts or employees from taking retaliatory action against anyone reporting harassment, bullying, or discrimination.

137.  LPOH thoroughly violated the requirements of DASA.

138.  Upon information and belief, LPOH did not have a DASA Coordinator for the entirety of the period that the Sisamis-Markman Children attended LPOH, but rather, had a DASA Coordinator for only some of that period.

139.  During that period, LPOH did not provide parents with the required annual notice of its DASA policies, reporting procedures, or DASA Coordinator.

140.  During that period, such information was not available on the LPOH website or school district website.

141.  During that period, despite receiving repeated reports from Plaintiffs, LPOH employees, including the named Defendants, failed to report incidents of bullying and

harassment of, and discrimination against, the Sisamis-Markman Children to the school's DASA Coordinator as required by DASA.

142. During that period, and until the Sisamis-Markmans made their formal DASA Complaint, LPOH did not undertake the "thorough investigation" of the reported incidents of bullying, harassment and discrimination required by DASA.

143. During that period, and until the Sisamis-Markmans made their formal DASA Complaint, LPOH did not take the prompt remedial action required by DASA.

144. Even after the Sisamis-Markmans made their formal DASA Complaint, LPOH's investigation was anything but "thorough."

145. To the contrary, the investigation was perfunctory.

146. Upon information and belief, LPOH's DASA investigation was a sham intended to reach the predetermined conclusion that no bullying, harassment, and discrimination had occurred.

147. Upon information and belief, LPOH and its employees and agents conducted a perfunctory, sham investigation designed to reach that predetermined conclusion because a determination that bullying, harassment, and discrimination under DASA had occurred would have triggered reporting requirements that LPOH wished to avoid.

148. Even after the formal DASA Complaint, LPOH did not take the remedial action required by DASA.

149. Instead, LPOH sent the Sisamis-Markmans retaliatory threats to report the family to CPS.

150. Such retaliation was a further violation of DASA.

151. As a result of Defendants' serial violations of DASA, Plaintiffs have been damaged in an amount to be proven at trial, but which is reasonably believed to be not less than $3,000,000.00, exclusive of costs, attorneys' fees, and punitive damages.

152. In addition, Plaintiffs seek preliminary and permanent injunctive relief requiring Defendant LPOH to establish adequate protocols for reporting and addressing religious and ethnic discrimination and bullying, including but not limited to antisemitic bullying, at LPOH.

### COUNT VI
(Intentional Infliction of Extreme Emotional Distress – Against LPOH,
Chan, Kerns, King, and Nagel)

153. Plaintiffs repeat and reallege the allegations of Paragraphs 1-152 above as though more fully set forth herein.

154. Defendants actions described above, and indifference to and enablement of the suffering of children entrusted to their care, was extreme and outrageous, atrocious, and utterly intolerable in a civilized community.

155. Indeed, as reflected in the New York State Legislature's enactment of DASA, New York State has enacted laws, regulations, and policy specifically designed to stamp out and prevent such acquiescence in and enablement of religious- and ethnically-based harassment and bullying of school children.

156. Allowing such bullying, including physical assaults on small children, without taking remedial steps entirely within Defendants' power and authority, goes beyond all possible bounds of decency.

157. Moreover, threatening to report a family to CPS in retaliation for reporting bullying, harassment, and discrimination targeting their children is extreme, outrageous, and atrocious behavior, exceeding all bounds of decency and utterly intolerable in a civilized community.

158.  In engaging in the above described behavior and deliberate indifference, Defendants displayed at least reckless disregard of the substantial likelihood of causing severe emotional distress to each and all of the Plaintiffs.

159.  Upon information and belief, the purpose and intent of sending the Sisamis-Markmans the retaliatory threats to report the family to CPS was to cause the Sisamis-Markmans severe emotional distress.

160.  The Sisamis-Markmans in fact suffered severe emotional distress as a result of Defendants' actions and deliberate indifference and refusals to act.

161.  For instance, as described above, the children are fearful, anxious, and feel the need to hide their Jewishness, requiring psychiatric care.

162.  In addition, upon information and belief the stress caused by the bullying of their children, and Defendants' refusal to address that bullying, and the attendant circumstances and obligations, triggered a flare-up of Ms. Sisamis-Markman's ulcerative colitis and led to the hospitalization of Mr. Sisamis-Markman relating to his immunoglobulin A deficiency.

163.  As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial, but which is reasonably believed to be not less than $5,000,000.00, exclusive of costs, attorneys' fees, and punitive damages.

**COUNT VI**
(Negligent Infliction of Emotional Distress – Against LPOH, Chan, Kerns, King, and Nagel)

164.  Plaintiffs repeat and reallege the allegations of Paragraphs 1-163 above as though more fully set forth herein.

165.  Defendants had a duty to protect I.S.M. from the physical assaults and ethnic- and religiously-based bullying directed at him by his tormentors.

166.   Defendants breached that duty by failing to take reasonable steps to prevent such assaults or punish the students involved.

167.   Defendants further breached that duty by failing to separate I.S.M. from his tormentors.

168.   Defendants' breaches caused I.S.M. to fear for his own safety.

169.   As a result of Defendants' conduct, Plaintiff I.S.M. has been damaged in an amount to be proven at trial, but which is reasonably believed to be not less than $5,000,000.00, exclusive of costs, attorneys' fees, and punitive damages.

**WHEREFORE**, Plaintiffs request a judgment:

(a) Awarding them damages in an amount to be proven at trial, but which are reasonably believed to be in excess of $8,000,000.00;

(b) Awarding them punitive damages in an amount to be proven at trial;

(c) Awarding them costs and attorneys' fees as provided by statute;

(d) Granting a permanent injunction directing LPOH to fully comply with all applicable civil and human rights laws and DASA, including by requiring LPOH staff and students to undergo mandatory annual training on antisemitic and other bigotry and bullying; and

(e) Awarding them such other and further relief as the Court deems right and proper.

Dated: New York, New York
       August 1, 2019

KAMERMAN, UNCYK, SONIKER &
KLEIN P.C.

By: _____
       Akiva M. Cohen
1700 Broadway, 42 Floor
New York, New York 10019
(212) 400-4930
*Attorneys for Plaintiff*